**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

SANDRA M. M., [1]
      Plaintiff,

         v.                                     Civil No. 3:19cv912

ANDREW M. SAUL,
Commissioner of Social Security,
      Defendant.


**MEMORANDUM OPINION**

This is an action seeking review of the decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff's application for disability insurance benefits under the Social Security Act. Sandra M. M. ("Plaintiff"), thirty-eight years old at the time of her benefits application, last worked as an office manager at a mobile home company, and as an assistant director at a Department of Corrections facility. (R. at 75.) Plaintiff suffers from diabetes mellitus with neuropathy and gastroparesis, as well as asthma. (R. at 18.) Plaintiff asserts that these impairments significantly impact her ability to perform work-related activities because she experiences nausea, vomiting, and pain that interfere with her ability to work. (R. at 55-60.)

On October 24, 2016, Plaintiff filed for disability insurance benefits. (R. at 196.) After Plaintiff's application was denied, and after exhausting her administrative remedies, Plaintiff seeks review of the Administrative Law Judge's ("ALJ") decision. This matter now comes before the

---

[1]     The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

Court by consent of the parties pursuant to 28 U.S.C. § 636(c)(1), on the parties' cross motions for summary judgment, rendering the matter ripe for review.[2]

For the reasons set forth below, the Court DENIES Plaintiff's Motion for Summary Judgment (ECF No. 15), DENIES Plaintiff's Motion for Remand (ECF No. 16), GRANTS Defendant's Motion for Summary Judgment (ECF No. 21), and AFFIRMS the final decision of the Commissioner.

## I. PROCEDURAL HISTORY

On October 24, 2016, Plaintiff filed an application for disability insurance benefits, alleging disability based on diabetes, neuropathy, asthma, hyperthyroidism, amyloidosis, and gastroesophageal reflux disease ("GERD"). (R. at 188-89.) The Social Security Administration denied Plaintiff's claim initially on January 4, 2017, and again upon reconsideration on February 21, 2017. (R. at 196, 207.) Plaintiff requested a hearing before an ALJ, and the hearing was held on September 19, 2018. (R. at 44, 221.) On December 27, 2018, the ALJ issued a written opinion, denying Plaintiff's claim and concluding that Plaintiff did not qualify as disabled. (R. at 15-29.) Plaintiff requested review of the ALJ's decision, and on October 30, 2019, the Social Security Administration Appeals Council denied the request, rendering the ALJ's decision as the final decision of the Commissioner. (R. at 1-3.) Plaintiff now seeks judicial review pursuant to 42 U.S.C. § 405(g).

---

[2]     The administrative record in this case remains filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these rules, the Court will exclude personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and financial account numbers from this Memorandum Opinion, and will further restrict its discussion of Plaintiff's medical information only to the extent necessary to properly analyze the case.

## II. FACTUAL BACKGROUND

Plaintiff alleges that her disability is driven by the symptoms and effects of Type I diabetes, as well as asthma. (R. at 55-64.) As a result of her diabetes, Plaintiff suffers from other conditions such as severe hypoglycemic unawareness, which causes low blood sugar and neuropathy, as well as gastroparesis.[3] (R. at 55-56, 60.) Plaintiff alleges that she averages two hypoglycemic seizures per week, which cause her to lose consciousness and experience confusion. (R. at 57-58, 67.) Plaintiff also alleges that she experiences neuropathy (numbness) in her arms, toes, feet, and legs, and that as a result, she feels pain "all day." (R. at 59.) Finally, as a result of Plaintiff's gastroparesis, Plaintiff experiences constipation and frequent vomiting. (R. at 60.)

Regarding Plaintiff's asthma, she has lung nodules, a persistent cough, and she uses a nebulizer for about fifteen minutes twice per day. (R. at 63-64.) Plaintiff has a long history of smoking cigarettes. (R. at 834.)

Plaintiff's treatment records are as follows:

In September 2016, Plaintiff began feeling gastrointestinal discomfort, and underwent an upper gastrointestinal endoscopy, which demonstrated a large hiatal hernia and probable GERD, but otherwise a normal stomach. (R. at 687-88.) Plaintiff then had an esophagram, which demonstrated moderate esophageal dysmotility with narrowing at the gastroesophageal junction, and a small to moderate sliding type hiatal hernia. (R. at 678.)

---

[3]     Gastroparesis is "a condition that affects the normal spontaneous movement of the muscles (motility) in your stomach." *Gastroparesis*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/gastroparesis/symptoms-causes/syc-20355787 (last visited March 19, 2021). Gastroparesis causes a person's stomach motility to slow down or not work at all, and prevents the stomach from emptying properly. *Id.*

Between October 2016 and October 2017, Plaintiff was seen by a variety of providers, largely to sort out a possible diagnosis for Amyloidosis, which was ultimately ruled out,[4] but also for her gastrointestinal symptoms. (R. at 584, 825.) Plaintiff reported symptoms such as weight gain, fatigue, constipation, difficulty swallowing, and vomiting. (R. at 557, 585, 735, 834, 882, 904, 1030.) Plaintiff was seen at the Mayo Clinic from January 2017 to April 2017, "for a comprehensive evaluation of her constellation of symptoms" including evaluations with the Gastroenterology Clinic. (R. at 825, 834, 875, 880, 882, 904-06.) Plaintiff also presented to Duke Health for "another evaluation of her amyloid." (R. at 790.) While there, she reported nausea and vomiting. (R. at 790.) Though an x-ray did show some constipation, a physical examination of Plaintiff's her abdomen was largely normal and demonstrated normal bowel sounds, soft abdomen, and no abdominal guarding or tenderness. (R. at 793.) Despite her symptoms, Plaintiff's providers recommended limited treatment, including an increase in Plaintiff's water intake; use of a stool softener, probiotics and magnesium; and both dietary and lifestyle changes, including quitting smoking and carb counting. (R. at 559, 737, 835.)

In September 2017, Plaintiff presented to Dr. Matthew Brengman for an initial consultation about diabetic gastroparesis. (R. at 1000.) After discussing surgery options with Plaintiff and reviewing her records from the Mayo Clinic, Dr. Brengman suggested a gastric stimulation and pyloroplasty for her symptoms. (R. at 1002.) Plaintiff underwent surgery in October 2017 to place the gastric stimulator. (R. at 992, 1410.) Two weeks after her surgery, Plaintiff reported that her

---

[4]     Amyloidosis is "a rare disease that occurs when an abnormal protein, called amyloid, builds up in your organs and interferes with their normal function." *Amyloidosis*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/amyloidosis/symptoms-causes/syc-20353178 (last visited March 3, 2021). Plaintiff went through an extensive workup at the Mayo Clinic (R. at 822-881), and after a number of tests, her provider at the Mayo Clinic ruled out primary amyloidosis, determined that an amyloid deposit in Plaintiff's left arm was caused by her insulin shots, and opined that no treatment was necessary. (R. at 880-81.)

vomiting had subsided, but she was still experiencing some nausea. (R. at 992.) Six weeks after her surgery, Plaintiff reported "mild intermittent episodes of nausea that occur once a week" and "deni[ed] any vomiting from gastroparesis." (R. at 989.) Despite such mild episodes, Dr. Brengman described Plaintiff's response to the gastric stimulator as "excellent." (R. at 991.)

The gastric stimulator initially appeared to alleviate Plaintiff's symptoms. (R. at 1115 (significantly improved symptoms); 1272 (no nausea or vomiting); 1389 (no nausea and normal bowel movements)). However, in June 2018, Plaintiff reported that she was again experiencing nausea and vomiting. (R. at 1366, 1368.) Nonetheless, a physician examination of Plaintiff demonstrated her abdomen was soft, non-distended, and nontender. (R. at 1369.) At the same visit, Plaintiff's diabetes was not under control, and she became hypoglycemic during her interview. (R. at 1372.) Several days later, Plaintiff reported feeling full and bloated, but denied any diarrhea and constipation. (R. at 1327-28.)

In July 2018, Plaintiff reported experiencing worsening nausea. (R. at 1385.) She reported that her nausea was not associated with vomiting or reflux, and occurred more frequently at night. (R. at 1385.) Upon examination, Plaintiff had bowel sounds present in all four quadrants. (R. at 1387.) An x-ray of Plaintiff's abdomen in August 2018 demonstrated no gastric outlet obstruction and normal small bowel follow-through. (R. at 1415-16.) An upper gastrointestinal endoscopy, performed around the same time, was normal. (R. at 1419.) Plaintiff weighed 179 pounds as of September 2018. (R. at 1441-42.)

At Plaintiff's hearing on September 19, 2018, Plaintiff provided additional testimony about her symptoms. (R. at 44-93.) Plaintiff stated that she is unable to digest enough food to keep her blood sugar elevated, which causes her to experience constant confusion. (R. at 56.) Plaintiff explained that she vomits "every time [she] eats" and "every time [she] drinks," and reported that

the day before the hearing, she vomited seven times. (R. at 60.) She testified that she lost weight due to vomiting, and currently weighed 152 pounds. (R. at 74.)

### III. THE ALJ'S DECISION

On December 17, 2018, the ALJ issued a written opinion, finding that Plaintiff did not qualify as disabled. (R. at 15-29.) The ALJ followed the five-step evaluation process established by the Social Security Act in analyzing Plaintiff's disability claim. (R. at 18-29); 20 C.F.R. § 404.1520(a)(4); *see Mascio v. Colvin*, 780 F.3d 632, 634-35 (4th Cir. 2015) (describing the ALJ's five-step sequential evaluation).

According to those regulations, at step one, the ALJ looks at the claimant's current work activity. § 404.1520(a)(4)(i). At step two, the ALJ asks whether the claimant's medical impairments meet the regulations' severity and duration requirements. § 404.1520(a)(4)(ii). Step three requires the ALJ to determine whether the medical impairments meet or equal an impairment listed in the regulations. § 404.1520(a)(4)(iii). Between steps three and four, the ALJ must assess the claimant's residual functional capacity, accounting for the most the claimant can do despite her physical and mental limitations. § 404.1545(a). At step four, the ALJ assesses whether the claimant can perform her past work given her residual functional capacity. § 404.1520(a)(4)(iv). Finally, at step five, the ALJ determines whether the claimant can perform any work existing in the national economy. § 404.1520(a)(4)(v).

In the instant case, at step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity from her alleged onset date of May 28, 2016. (R. at 18.) At step two, the ALJ determined that Plaintiff suffered from the following severe impairments: diabetes mellitus with neuropathy and gastroparesis; and asthma. (R. at 18.) At step three, the ALJ

determined that neither of these impairments, individually or in combination, met or equaled a disability listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 19-20.)

After step three, the ALJ determined Plaintiff's residual functional capacity based on an evaluation of the evidence, including medical records, Plaintiff's testimony, and the findings of treating and examining health care providers. (R. at 20-26.) Based on this evidence, the ALJ determined that Plaintiff retained the ability to perform light work with the following limitations:

> [Plaintiff] can never climb ladders/ropes/scaffolds, occasionally kneel, crouch, and crawl, and frequently climb ramps/stairs, balance, and stoop. She should avoid concentrated exposure to temperature extremes, wetness, and humidity and even moderate exposure to respiratory irritants (such as fumes/odors/dusts/gases/poor ventilation) and workplace hazards (such as moving machine parts and unprotected heights).

(R. at 20.) The ALJ explained this determination by extensively summarizing the evidence in the record and holding that the objective medical findings in the record demonstrated that Plaintiff had functional limitations that were not as severe as Plaintiff alleged. (R. at 20–26.)

Based on this determination, the ALJ then considered, at step four, whether Plaintiff could perform her past relevant work. (R. at 27.) Based on the vocational expert's testimony, ALJ concluded that Plaintiff was capable of performing some of her past relevant work, specifically her past work as a payroll clerk, office manager, bookkeeper, and salesperson. (R. at 27.)

At step five, the ALJ considered whether Plaintiff could perform other jobs existing in significant numbers in the national economy. (R. at 27.) The ALJ weighed the testimony of the vocational expert, who opined that Plaintiff could perform the requirements of occupations such as garment sorter, price marker, and ticket seller. (R. at 27-28.) The ALJ determined that, given Plaintiff's age, education, work experience, and residual functional capacity, Plaintiff can make a successful adjustment to other work that exists in significant numbers in the national economy. (R. at 28.) The ALJ, therefore, concluded that a finding of "not disabled" was appropriate. (R. at 28.)

## IV. STANDARD OF REVIEW

This Court upholds an ALJ's Social Security disability determination if "(1) the ALJ applied the correct legal standards and (2) substantial evidence supports the ALJ's factual findings." *Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 94 (4th Cir. 2020) (citing 42 U.S.C. § 405(g) and *Pearson v. Colvin*, 810 F.3d 204, 207 (4th Cir. 2015)).

"Substantial evidence is that which a reasonable mind might accept as adequate to support a conclusion." *Pearson*, 810 F.3d at 207 (internal quotation marks omitted). Substantial evidence thus requires more than a scintilla of evidence, but less than a preponderance of the evidence. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Between these two evidentiary thresholds lies a "zone of choice" where the ALJ's decision can go either way without interference by the courts. *See Dunn v. Colvin*, 607 F. App'x 264, 274 (4th Cir. 2015) (quoting *Clarke v. Bowen*, 843 F.2d 271, 272–73 (8th Cir. 1988)). "'In reviewing for substantial evidence, we do not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute our judgment' for the ALJ's." *Arakas*, 983 F.3d at 95 (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)).

In considering the decision of the ALJ based on the record as a whole, the court must take into account "whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)). If substantial evidence in the record supports the ALJ's findings as to any fact, it is binding on the reviewing court regardless of whether the court disagrees with such findings. *Hancock*, 667 F.3d at 476. "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). If substantial evidence in the record does not support the ALJ's determination or if the ALJ has made an error of law, the Court must reverse the decision. *See id.*

# V. ANALYSIS

Plaintiff's appeal to this Court challenges the ALJ's finding of "not disabled," arguing the ALJ erred by (1) failing to properly consider Plaintiff's pain; (2) rejecting the opinions of Plaintiff's treating physicians; and (3) failing to properly account for Plaintiff's pulmonary impairments. (Pl.'s Brief in Supp. of Pl.'s Mot. For Summ. J. 7-8, ECF No. 17 ("Pl.'s Mem.").) For the reasons set forth below, the ALJ did not err in denying the Plaintiff's application for benefits.

## A. The ALJ Did Not Err in Evaluating Plaintiff's Pain.

Plaintiff argues that the ALJ erred by performing an improper *Craig v. Chater* pain analysis. (Pl.'s Mem. at 8-11 (referencing *Craig v. Chater*, 76 F.3d 585 (4th Cir. 1996)).) First, Plaintiff argues that the ALJ did not make an adequate finding at step one of the *Craig* pain analysis because the ALJ failed to identify which symptoms could reasonably be produced by Plaintiff's impairments. (Pl.'s Mem. at 8-9.) Second, Plaintiff argues that the ALJ erred at step two of the *Craig* pain analysis by improperly considering Plaintiff's pain related to gastroparesis, constipation, and hiatal hernia. (Pl.'s Mem. at 9-11.) In response, Defendant contends that the ALJ fully explained how Plaintiff's alleged symptoms were inconsistent with the record, and that the ALJ reasonably discounted Plaintiff's gastrointestinal complaints in light of the record. (Def.'s Mot. For Summ. J. and Br. in Supp. 17-23, ECF No. 21 ("Def.'s Mem.").) The Court addresses each argument in turn.

After step three of the ALJ's sequential analysis, but before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's residual functional capacity. 20 C.F.R. § 404.1545(a). The residual functional capacity must incorporate impairments supported by the objective medical evidence in the record and those impairments that

are based on the claimant's credible complaints. § 404.1545(a). When evaluating a claimant's subjective complaints of pain in the context of a residual functional capacity determination, the ALJ must follow a two-step analysis. § 404.1529(a); *Craig*, 76 F.3d at 594; *see also* SSR 96-7p, 1996 WL 374186 (July 2, 1996).

The first step of the *Craig* analysis requires the ALJ to determine the existence of an underlying medically determinable physical or mental impairment or impairments that could reasonably produce the claimant's alleged pain or other symptoms. § 404.1529(b); *Craig*, 76 F.3d at 594. This threshold determination requires a showing, by objective evidence, "of the existence of a medical impairment 'which could be reasonably expected to produce' the actual pain, in the amount and degree, alleged by the claimant." *Craig*, 76 F.3d at 594. Only after this threshold determination may the ALJ proceed to the second step and evaluate the intensity and persistence of those symptoms to determine the extent to which they limit the claimant's ability to work. *Id.* at 595.

The second step, in which the ALJ is determining the extent to which the pain impairs the claimant's ability to work, requires the ALJ to consider objective medical evidence and other objective evidence, as well as the claimant's allegations. *Id.* "Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers." *Id.* at 595; § 404.1529(c)(4).

The Fourth Circuit has determined that "[w]hen factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional

circumstances.'" *Carpenter v. Berryhill*, No. 3:17cv248, 2018 WL 3385191, at *12 (E.D. Va. May 31, 2018) (quoting *Eldeco, Inc. v. N.L.R.B.*, 132 F.3d 1007, 1011 (4th Cir. 1997)). Thus, "[w]hen the ALJ appropriately considers all relevant factors, hears the claimant's testimony and observes [her] demeanor, the ALJ's credibility determination deserves [] deference." *Id.* (citing *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984)). Therefore, this Court must accept the ALJ's factual findings and credibility determinations unless "a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all." *Id.* (quoting *N.L.R.B. v. McCullough Envtl. Servs., Inc.*, 5 F.3d 923, 928 (5th Cir. 1993)).

      1. The ALJ Did Not Err at Step One of the *Craig* Pain Analysis.

First, Plaintiff argues that the ALJ erred at the first step of the *Craig* pain analysis by finding that Plaintiff's impairments could reasonably be expected to cause *some* of the alleged symptoms, without identifying which symptoms Plaintiff's impairments could not reasonably be expected to produce and, conversely, without identifying which symptoms Plaintiff's impairments could reasonably be expected to produce. (Pl.'s Mem. at 8.)

Here, the ALJ laid out the two steps of the *Craig* pain analysis at the outset of the decision. (R. at 20-21.) Subsequently, the ALJ reviewed Plaintiff's testimony about her capabilities, and concluded that "the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (R. at 21.)

The ALJ satisfied the first step of the *Craig* analysis because the ALJ found the existence of a medical impairment and continued the analysis to the second step of the inquiry. *See Powell*

*v. Colvin*, No. 3:16-cv-56, 2016 WL 6562071, at \*5-6 (E.D. Va. Oct. 14, 2016) (finding no error at step one where the ALJ found the existence of a medical impairment and progressed to the second step). Despite Plaintiff's contention, this Court has repeatedly held that an ALJ does not err at step one in the *Craig* analysis by finding that the claimant's impairments could cause *some* of the alleged symptoms at the first step. *See Thomas v. Saul*, No. 3:18-cv-700, 2019 WL 3801850, at \*13 (E.D. Va. July 25, 2019) (finding ALJ does not err at step one of *Craig* analysis by using word "some" and citing cases where courts have held the same), *report and recommendation adopted*, 2019 WL 3779515 (E.D. Va. Aug. 12, 2019); *Wanda H. v. Saul*, No. 3:19-cv-001, 2019 WL 6709387, at \*6 (E.D. Va. Dec. 9, 2019) (same). In *Thomas v. Saul*, the Court explained that, when an ALJ finds that Plaintiff's medically determinable impairments could reasonably be expected to produce *some* of Plaintiff's symptoms, the ALJ "merely reject[s] some of the symptoms alleged by Plaintiff while accepting others," and such a finding comports with the Fourth Circuit's decision in *Craig*. 2019 WL 3801850, at \*13. Accordingly, the ALJ properly evaluated Plaintiff's subjective complaints at the first step of the *Craig* analysis.

   2. The ALJ Did Not Err at Step Two of the *Craig* Pain Analysis in Evaluating Plaintiff's
      Pain Related to Gastroparesis, Constipation, and Hiatal Hernia.

   Plaintiff next argues that the ALJ erred in evaluating the severity of Plaintiff's pain related to gastroparesis, constipation, and hiatal hernia[5] in the residual functional capacity determination.

---

[5]   Although Plaintiff's argument includes hiatal hernia as one of three sources of pain which the ALJ failed to properly consider, the record does not indicate this condition was a source of pain for Plaintiff. The Plaintiff's argument notes only that Plaintiff was diagnosed in September 2016 as having a hiatal hernia, and that the condition "was still on her active problem list" as of the date of the hearing. (Pl.'s Mem. at 5.) Further, there is no indication from the record that Plaintiff's hiatal hernia diagnosis resulted in any functional limitations. A diagnosis "without more, does not establish that [a person] suffers from any particular symptoms or limitations." *Felton-Miller v. Astrue*, 459 F. App'x 226, 230 (4th Cir. 2011). Here, the ALJ recognized Plaintiff's hiatal hernia diagnosis, but appropriately concluded, based on the record, that it does

(Pl.'s Mem. at 9-11.) Plaintiff contends that the pain resulting from these impairments required a limitation in her attention and concentration, and that the ALJ should have included such limitations in the residual functional capacity determination and the ALJ's questions to the vocational expert. (Pl.'s Mem. at 10-11.)

This Court must give great deference to the ALJ's credibility determinations. *Eldeco, Inc. v. N.L.R.B.*, 132 F.3d 1007, 1011 (4th Cir. 1997). After considering the medical evidence, medical opinions, Plaintiff's range of daily activities, and Plaintiff's testimony, the ALJ concluded that "[t]he longitudinal record" was "inconsistent with the [Plaintiff's] allegations regarding the severity of her symptoms and limitations." (R. at 25.) Specifically, with respect to Plaintiff gastroparesis and accompanying constipation, the ALJ noted that "[d]espite [Plaintiff's] testimony that her stimulator only helped until January or February of 2018, the records note significant improvement after gastric stimulator placement and she reported eating well through at least April 2018. She did not report any problems until June 2018." (R. at 25.) Moreover, the ALJ noted several inconsistencies between Plaintiff's statements and the record evidence. Specifically, the ALJ observed that Plaintiff testified that she weighed 152 pounds, but records indicated that she weighed 179 mere weeks before her hearing. (R. at 25-26.) The ALJ also determined that although Plaintiff alleged difficulty with opening jars and handling buttons, the record did not reflect that she reported any difficulty with manipulation, and no objective medical evidence demonstrated decreased grip strength. (R. at 25.) Similarly, though Plaintiff alleged difficulty with daily activities such as getting in and out of the bath or getting dressed, Plaintiff's medical records do

---

not result in any functional limitations. (R. at 20, 22.) For these reasons, the ALJ did not err in his consideration of Plaintiff's hiatal hernia.

not reflect that she reported these issues to her medical providers, and Plaintiff appears to have reported no issues with her balance or confusion. (R. at 25.)

Having considered this evidence, the ALJ explained that the residual functional capacity determination limiting Plaintiff to light work with some postural limitations was supported by evidence in the record, including Plaintiff's complaints of pain. (R. at 20, 26.) Specifically, the ALJ concluded that the postural and environmental limitations imposed accommodated Plaintiff's complaints of pain. (R. at 26.) Thus, giving the ALJ's credibility determination deference, the ALJ appropriately reviewed the record and evaluated Plaintiff's symptoms and pain to determine that they did not significantly limit Plaintiff's ability to do work activities beyond the limitations identified in her residual functional capacity determination.

Relatedly, Plaintiff also contends that the ALJ erred at step two given the opinions of Drs. Suslick and Brengman. (Pl.'s Mem. at 10.) Both Drs. Suslick and Brengman opined that Plaintiff would experience "pain, fatigue, or other symptoms" that would "frequently" interfere with her attention and concentration. (R. at 1055, 1457.) As an initial matter, although Plaintiff contends that the ALJ "did not even consider this aspect" of the doctors' opinions, the record reflects sufficient consideration. The ALJ recognized that Dr. Suslick's assessment was "based on [Plaintiff's] reported symptoms and limitations, rather than on objective findings and diagnostic test results." (R. at 26.) By Dr. Suslick's own description, he saw Plaintiff "irregularly" and treated her for a variety of complaints unrelated to gastroparesis, constipation, and hiatal hernia. (*See e.g.*, R. at 972 (cough, chills, body aches); 975 (amyloidosis, shortness of breath, vomiting); 980 (anxiety); 983 (allergic reaction); 1006 (elevated blood pressure, knot on back of neck, referral); 1021 (eye swelling); 1030 (fever, vomiting, diarrhea); 1052 (describing his treatment of Plaintiff as "irregular").) During these visits, Plaintiff did not complain of abdominal pain caused by

14

gastroparesis, constipation or hiatal hernia. On the occasions that Plaintiff did report abdominal pain, Dr. Suslick consistently found Plaintiff had a soft abdomen with no abdominal tenderness. (R. at 736, 1027, 1032, 1425.) Moreover, Dr. Suslick's treatment notes never expressed any findings that Plaintiff's pain caused any concern with her ability to concentrate. (*See e.g.*, R. at 981, 1018, 1270, 1280.)

As for Dr. Brengman, the record is not at all clear whether he opined that Plaintiff's pain would interfere with her attention and concentration. (*See* R. at 1457.) In his opinion, Dr. Brengman did not specify which, if any, of Plaintiff's symptoms would affect her ability to maintain attention or concentrate. Instead, Dr. Brengman indicated that Plaintiff's attention and concentration would be limited due to "pain, fatigue, *or some other symptoms*." (R. at 1457 (emphasis added).) In other portions of Dr. Brengman's opinion, he indicated the Plaintiff's pain would only occur with meals, and only rated Plaintiff's pain as moderate. (R. at 1456.) Notably, Dr. Brengman stated that Plaintiff's "primary symptoms" were nausea and vomiting, and declined to include "pain" as one of Plaintiff's primary symptoms. (R. at 1455.) Nor do Dr. Brengman's treatment notes reflect that Plaintiff was experiencing disabling pain. (*See* R. at 992 (reporting intermittent abdominal pain); 1387 (denying the existence of abdominal pain).) Accordingly, the ALJ did not err by not accepting the opinions of Drs. Suslick and Brengman in evaluating Plaintiff's subjective complaints of pain.

In sum, the ALJ properly considered Plaintiff's pain in determining her residual functional capacity, and remand is not warranted on this ground.

### B.  The ALJ Properly Considered the Opinions of Drs. Suslick and Brengman.

Plaintiff also argues that the ALJ erred by failing to explain his reasons for rejecting the opinions of Plaintiff's treating physicians, Dr. Suslick and Dr. Brengman. With respect to Dr.

Suslick's opinion, Plaintiff contends the ALJ's explanation for rejecting Dr. Suslick's opinion is "too conclusory and nonspecific" and "failed to point to any specific evidence that contradict[s]" Dr. Suslick's opinion. (Pl.'s Mem. at 13-14.) As for Dr. Brengman, Plaintiff contends the ALJ should not have rejected Dr. Brengman's opinion as nonspecific to Plaintiff, and the ALJ erred by not addressing Dr. Brengman's opinion that Plaintiff needs ready access to a restroom. (Pl.'s Mem. at 17-18.) In response, Defendant argues that the ALJ applied the correct regulations to find that the opinions of Drs. Suslick and Brengman were unsupported by, and inconsistent with the record. (Def.'s Mem. at 24-32.)

In general, an ALJ must consider all medical opinions in the record. § 404.1527(c). An opinion provided by a treating source, however, is given special significance by the regulations. § 404.1527(c)(2). A treating source is a "medical source who provides [the claimant], or has provided [the claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." § 404.1527(a)(2). Under the "treating physician rule," an ALJ must give a medical opinion from a treating source controlling weight if the opinion is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques," and (2) "not inconsistent with the other substantial evidence." § 404.1527(c)(2); *see Arakas*, 983 F.3d at 106; SSR 96-2p, 1996 WL 374188 (July 2, 1996).[6]

If a medical opinion from a treating source is not entitled to controlling weight, the ALJ must consider certain factors to determine the weight to afford the opinion. § 404.1527(c)(2)–(6); *see Arakas*, 983 F.3d at 106. Those factors are: (1) the length of the treating source relationship

---

[6]   Effective March 27, 2017, the Social Security Administration rescinded SSR 96-2p and what is known as the "treating physician rule." 82 Fed. Reg. 5844-01, at 5844-45, 5854-55 (Jan. 18, 2017). Plaintiff filed her application for benefits in 2016, before the Social Security Administration rescinded the rule. (R. at 196.)

and frequency of examination; (2) the nature and extent of the treatment relationship; (3) supportability based upon the medical record; (4) consistency between the opinion and the medical record; (5) any specialization on the part of the treating source; and (6) any other relevant factors brought to the ALJ's attention which tend to support or contradict the medical opinion. § 404.1527(c)(2)–(6). "While an ALJ is not required to set forth a detailed factor-by-factor analysis in order to discount a medical opinion from a treating physician, it must nonetheless be apparent from the ALJ's decision that he meaningfully considered *each* of the factors before deciding how much weight to give the opinion." *Dowling v. Comm'r, Soc. Sec. Admin.*, 986 F.3d 377, 385 (4th Cir. 2021). Generally, a reviewing court should not disturb an ALJ's decision regarding the weight given to a medical opinion "absent some indication that the ALJ has dredged up 'specious inconsistencies,' or has failed to give a sufficient reason for the weight afforded a particular opinion." *Dunn*, 607 F. App'x at 267 (citing *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992)).

### 1. The ALJ Properly Considered Dr. Suslick's Opinion.

Dr. Suslick began treating Plaintiff in July of 2015, and appears to have been Plaintiff's primary care physician. (R. at 739.) He reported that he saw Plaintiff irregularly, estimating visits anywhere from once a year to eight times per year. (R. at 739, 1052.) Dr. Suslick completed two impairment questionnaires on behalf of Plaintiff on January 13, 2017 and April 4, 2018. (R. at 739-43, 1052-56.) Both questionnaires reported diagnoses for Type I diabetes and diabetes mellitus; nontoxic multinodular goiter; abdominal pain; dyspnea; amyloidosis; gastroparesis; GERD; and neuropathy. (R. at 739-40, 1052-53.)

In the January 13, 2017 report, Dr. Suslick noted that Plaintiff experiences daily pain in her chest and abdomen, exacerbated by eating. (R. at 740.) He also opined that Plaintiff must rise

from a seated position once every ten minutes, and could not return to a seated position for thirty minutes. (R. at 741.) Moreover, he opined that it was medically necessary for Plaintiff to elevate her legs while sitting, "all day." (R. at 741.) According to the questionnaire, Plaintiff could never lift any weight; could never or rarely grasp, turn, and twist objects; and could never or rarely use her hands or fingers for fine manipulations. (R. at 741-42.)

In the April 4, 2018 report, Dr. Suslick stated that Plaintiff experiences cramping in her abdomen, arms, and legs, which is "almost always present." (R. at 1053.) Dr. Suslick noted that Plaintiff's symptoms are aggravated or precipitated by low or high blood glucose levels, as well as sleeping or activity. (R. at 1053.) Dr. Suslick opined that Plaintiff had to get up from a seated position once every ten minutes, and could not return to a seated position for five minutes. (R. at 1054.) Additionally, Dr. Suslick stated that it was medically necessary for Plaintiff to elevate both legs for ten to fifteen minutes, three times per hour. (R. at 1054.) Again, Dr. Suslick opined that Plaintiff could never lift or carry any weight. (R. at 1054.)

After considering Plaintiff's medical history including Dr. Suslick's treatment notes, the ALJ explained that he rejected Dr. Suslick's opinion that Plaintiff is unable to work because it was unsupported by the overall record—which demonstrated limited physical findings and generally routine and conservative treatment. More importantly, the ALJ rejected Dr. Suslick's opinion as unsupported by Dr. Suslick's own treatment notes "showing either generally normal findings (except occasional positive respiratory findings)." (R. at 26.) The ALJ noted that Dr. Suslick's opinion was, at times, based on "no examinations at all." (R. at 24 (citing that, despite Plaintiff appearing "uncomfortable," Dr. Suslick "did not perform a physical examination); 26.) Additionally, the ALJ noted that no other treating sources suggested Plaintiff was unable to work at all. (R. at 26.)

18

Although Dr. Suslick was a treating physician, the ALJ did not err in rejecting his opinions as inconsistent with the evidence of record. In deciding not to give Dr. Suslick's opinions controlling weight, the ALJ explained that Dr. Suslick's opinions were inconsistent with other substantial evidence in the record, including Dr. Suslick's own treatment notes. As noted by the ALJ, Dr. Suslick's own treatment of Plaintiff was routine, and demonstrated normal findings. (R. at 1006-51, 1269-81.) For example, the ALJ noted that, although Dr. Suslick opined that Plaintiff had significant limitations in her ability to work and should to elevate her legs for ten to fifteen minutes, three times per hour, none of Dr. Suslick's treatment notes suggest that he ever advised Plaintiff that elevating her legs was necessary. (R. at 26, 1054.) In fact, none of Dr. Suslick's treatment notes demonstrated that Plaintiff had any significant swelling in her legs. (R. at 1018 (no leg edema); 1027 (no edema).) Nor did Plaintiff frequently complain of pain in her legs from neuropathy that would require Plaintiff to elevate her legs. (R. at 972 (no complaints of neuropathy pain); 975 (same); 778 (same); 980 (same); 1019 (same); 1023 (same); 1027 (same).) Plaintiff only complained of neuropathy pain to Dr. Suslick twice, and Dr. Suslick did not, on either occasion, recommend Plaintiff elevate her legs. (R. at 1006 (prescribing gabapentin); 1032-33 (no treatment recommended for Plaintiff's bilateral leg pain).) Moreover, no other medical records indicate significant swelling in Plaintiff's legs, and no other treatment providers required Plaintiff to elevate her legs. (*See* R. at 26, 793 (no edema); 823 (trace edema bilaterally); 878 (trace edema bilaterally); 990 (no edema).) Because Dr. Suslick opined on several limitations that were inconsistent with other evidence in the record, the ALJ appropriately gave his opinion less than controlling weight. *See, e.g.*, *Sharp v. Colvin*, No. 3:14cv340-, 2015 WL 1517416, at *4 (E.D. Va. Apr. 1, 2015), *aff'd*, 660 F. App'x 251 (4th Cir. 2016) (upholding ALJ's decision to give treating physician's opinion

less than controlling weight where the treating physician's opinion was inconsistent with his own treatment notes and other evidence in the record).

The ALJ's decision also evidences that the ALJ considered the factors set forth in § 404.1527(c)(2)–(6) in determining how much weight to assign Dr. Suslick's opinions. The ALJ cited Plaintiff's treatment records with Dr. Suslick, and the findings that Dr. Suslick made during each visit, evidencing that the ALJ considered the length of the treating source relationship, frequency of examination, and the nature and extent of the treatment relationship. (R. at 18, 22-24.) As previously explained, the ALJ noted that Dr. Suslick's opinions were unsupported by his own treatment notes, which demonstrated generally normal findings, or other evidence in the record. (R. at 24, 26.) The ALJ explained that, although Dr. Suslick opined on significant limitations for Plaintiff, his treatment notes demonstrated limited physical findings, and routine conservative treatment. (R. at 26.) The ALJ also explained that Dr. Suslick's opinions were inconsistent with the longitudinal record, including that no other treatment providers came to the same conclusions as Dr. Suslick. (R. at 26.) There is no indication that Dr. Suslick was a specialist of any kind, and in fact, as the ALJ detailed throughout the decision, he treated Plaintiff for a variety of complaints, including respiratory issues, diarrhea, vomiting, elevated blood sugar levels, and pain associated with mobility. (R. at 22-26, 972, 975, 980, 983, 1006, 1021, 1030.) For these reasons, the ALJ adequately explained his reasons for discounting Dr. Suslick's opinion.

Plaintiff briefly raises two additional arguments to no avail. First, Plaintiff contends that the ALJ only considered a single opinion from Dr. Suslick—that Plaintiff is unable to work. (Pl.'s Mem. at 12.) However, reviewing the ALJ's opinion, the ALJ addressed both Dr. Suslick's 2017 and 2018 reports, and the detailed opinions contained in each. (R. at 22, 24.) The ALJ considered Dr. Suslick's first opinion that Plaintiff:

> [C]ould sit less than 1 hour total in a workday, stand/walk less than 1 hour total in a workday, never lift any weight, elevate both legs at waist level all day, get up from a seated position every 10 minutes to move around for 30 minutes, never/rarely reach, handle, or finger, continually take unscheduled rest breaks during a workday, and be absent more than three times per month.

(R. at 22 (describing the 2017 report).) The ALJ then noted Dr. Suslick's second opinion that Plaintiff:

> [C]ould sit and stand/walk less than 1 hour total in a workday, never lift any weight, elevate both legs six inches or less for 10 to 15 minutes three times per hour, never reach, handle, or finger, [] would need unscheduled breaks every 15 minutes, and be absent from work more than three times per month.

(R. at 24 (describing the 2018 report).) Accordingly, the ALJ clearly considered each of Dr. Suslick's reports, and the detailed opinions contained therein.

Second, Plaintiff disputes the ALJ's statement that "[t]he assessment prepared by Dr. Suslick is more based on claimant's reported symptoms and limitations, rather than objective findings and diagnostic test results." (Pl.'s Mem. at 15 (citing R. at 26).) However, this observation by the ALJ is supported by Dr. Suslick's treatment notes, which confirm that Plaintiff appeared twice for the sole purpose of filling out her disability paperwork. (R. at 978 ("[Plaintiff] comes in to have her [d]isability form filled."); 1269 (appearing for "forms"). On these occasions, Dr. Suslick met with Plaintiff for fifty to sixty minutes, which was spent completing the disability forms face-to-face with Plaintiff. (R. at 979, 1271.)

For these reasons, the ALJ appropriately evaluated Dr. Suslick's opinions after finding those opinions should be afforded less than controlling weight, and the ALJ did not err in rejecting his opinions.

### 2. The ALJ Properly Considered Dr. Brengman's Opinion.

Dr. Brengman began treating Plaintiff in September 2017, after she was diagnosed with diabetic gastroparesis. (R. at 1000.) In October 2017, Dr. Brengman laparoscopically inserted a

gastric stimulator, which was characterized by the medical records as an elective surgery. (R. at 992, 1000, 1002, 1410.) Dr. Brengman continued to follow up with Plaintiff after her surgery. (R. at 989-992.) He described Plaintiff's response to the gastric stimulator as "excellent." (R. at 991.) Although Plaintiff initially responded well to the surgery, reporting only "mild intermittent episodes of nausea" and no vomiting, by July 2018, she described worsening gastrointestinal symptoms. (R. at 989, 1385.) Plaintiff reported that she was experiencing nausea, denied vomiting, and explained that her symptoms occurred more frequently at night. (R. at 1385.) Dr. Brengman ordered several tests, which all came back with normal findings. (R. at 1387, 1416, 1418-19.)

Dr. Brengman filled out a "Gastrointestinal Disorders Impairment Questionnaire" on October 4, 2018. (R. at 1454-59.) Therein, Dr. Brengman rated Plaintiff's pain as "moderate" and stated that the pain occurs "daily with meals." (R. at 1456.) He then opined that Plaintiff's symptoms were severe enough to interfere with her attention and concentration "frequently" and that Plaintiff was "incapable of even 'low stress'" because "when vomiting[,] patients are universally unable to tolerate stress." (R. at 1457.) Dr. Brengman also noted that Plaintiff would need ready access to a restroom. (R. at 1458.) Dr. Brengman left many blanks on his questionnaire, and declined to opine on Plaintiff's ability to sit, stand and walk; whether she had any lifting and carrying restrictions; and how often Plaintiff could be absent from work. (R. at 1457-58.)

The ALJ afforded Dr. Brengman's opinion "little weight." (R. at 26.) The ALJ explained that he found Dr. Brengman's opinion unsupported by the record, because his opinion appeared unspecific to Plaintiff and only related to vomiting. (R. at 26.) The ALJ also explained that he found Dr. Brengman's opinion that Plaintiff could not perform even low stress jobs inconsistent with the record, "as the evidence does not document vomiting at a frequency that would limit her during the workday." (R. at 26.)

The ALJ did not err in declining to afford Dr. Brengman's opinion less than controlling weight. As the ALJ explained, Dr. Brengman's opinions were inconsistent with other evidence in the record, which demonstrated that Plaintiff was not experiencing nausea at a frequency that would render her unable to work. (R. at 1385 (reporting nausea occurring more frequently at night and denying any vomiting).) Additionally, there is no indication that Dr. Brengman's opinions are "well-supported by acceptable clinical and laboratory diagnostic techniques." (*See* R. at 1457.) Instead, Dr. Brengman's records indicate that Plaintiff reported to him that she was experiencing intermittent episodes of vomiting, but, Dr. Brengman's diagnostic testing returned with normal results. (R. at 989-994, 1387, 1416, 1418-19.) Although Dr. Brengman checked "yes" to the question of whether Plaintiff needed a job that permits ready access to a restroom, he did not offer any explanation for why such a limitation would be warranted, and declined to opine on how often Plaintiff would need to use the restroom. Accordingly, the ALJ did not err in determining that Dr. Brengman's opinions were not entitled to controlling weight.

The ALJ's decision reflects that the ALJ sufficiently considered the factors set forth in § 404.1527(c)(2)-(6) in determining to afford Dr. Brengman's opinion little weight. The ALJ noted that Dr. Brengman was Plaintiff's surgeon and cited Dr. Brengman's treatment records and findings, demonstrating that he considered the treatment relationship between Dr. Brengman and Plaintiff. (R. at 24-25.) Dr. Brengman did not provide any medical signs or laboratory findings that would support Plaintiff's frequent vomiting, and Dr. Brengman did not provide an explanation for his opinions. (R. at 1457.) The ALJ explained that other evidence did not demonstrate Plaintiff was vomiting at a frequency that would limit her during the workday. (R. at 26.) Finally, the ALJ was persuaded to give Dr. Brengman's opinions little weight by "other factors" including that Dr. Brengman did not opine on any of Plaintiff's functional limitations, and made generalized

comments about patients who vomit, rather than Plaintiff specifically. (R. at 26, 1457.) Thus, although the ALJ did not provide "a detailed factor-by-factor analysis" to evaluate Dr. Brengman's opinion, it is clear from the ALJ's decision that the ALJ "meaningfully considered" the factors set forth § 404.1527(c)(2)-(6) in deciding to afford Dr. Brengman's opinion little weight. *Dowling*, 986 F.3d at 385.

Therefore, the ALJ did not err in assigning Dr. Brengman's opinion little weight.

### C. Substantial Evidence Supports the Pulmonary Impairments in Plaintiff's Residual Functional Capacity Determination.

Plaintiff argues that the ALJ erred in considering the limitations necessary to address Plaintiff's asthma and shortness of breath. (Pl.'s Mem. at 18-19.) Specifically, Plaintiff contends that the ALJ's attempts to account for Plaintiff's shortness of breath and asthma by providing that Plaintiff avoid "concentrated exposure to temperature extremes, wetness, and humidity and even moderate exposure to respiratory irritants" was improper because there is no evidence that Plaintiff's asthma and shortness of breath are caused by any of these environmental sources. (Pl.'s Mem. at 18.)

The ALJ's residual functional capacity determination must account for all credibly established limitations. § 404.1545(a). When a medically determinable impairment stemming from environmental factors affects a claimant's work-related abilities, the ALJ must account for those limitations in the residual functional capacity. § 404.1545(d).

Here, the ALJ recognized Plaintiff's pulmonary impairments, and found that, while Plaintiff "had occasional acute respiratory disorders, such as bronchitis . . . she rarely had asthma exacerbations requiring hospitalization and she has not required at home oxygen therapy." (R. at 25.) In support of this observation, the ALJ considered a CT scan of Plaintiff's chest in September 2016, which demonstrated upper lung zone ground glass nodularity, favoring a smoking-related

lung disease and features of small airway disease. (R. at 22, 713-14.) Plaintiff also underwent a pulmonary function test that showed borderline airway obstruction. (R. at 23, 859.)

Plaintiff's claim that "there is no evidence" that Plaintiff's asthma and shortness of breath are caused by any environmental sources is belied by the record. (Pl.'s Mem. at 18.) Plaintiff specifically testified that exposure to heat causes her to experience breathing issues. (R. at 64.) She also testified that she cannot be around any smells, including candles, perfume, and cigarette smoke. (R. at 64.) Similarly, state agency physician Tony Constant opined that, based on Plaintiff's neuropathy and asthma, she should avoid concentrated exposure to extreme cold, extreme heat, wetness, and humidity, as well as even moderate exposure to fumes, odors, dusts, gases, and poor ventilation. (R. at 203-04.) Accordingly, the ALJ properly accounted for her asthma and shortness of breath by crafting a residual functional capacity that prevented Plaintiff from exposure to environmental irritants. (R. at 20.) Plaintiff does not identify what, if any, additional limitations the ALJ should have imposed to account for Plaintiff's asthma and shortness of breath.

Plaintiff also contends that the ALJ failed to account for Plaintiff's use of a nebulizer, which Plaintiff uses for fifteen minutes twice daily. (Pl.'s Mem. at 19.) However, the ALJ is only required to consider Plaintiff's ability to function in a workday. *See* SSR 96-8p, 1996 WL 374184 (July 2, 1996) (explaining that residual functional capacity is "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . . mean[ing] 8 hours a day, for 5 days a week, or an equivalent work schedule.") There is no indication in the record that Plaintiff's nebulizer use for fifteen minutes twice per day would interfere with her ability to work or function in a workday.

Accordingly, the ALJ properly accounted for Plaintiff's pulmonary impairments by including proper limitations in Plaintiff's residual functional capacity, and substantial evidence supports the ALJ's determination.

## VI. CONCLUSION

For the reasons set forth above, the Court hereby ORDERS that Plaintiff's Motion for Summary Judgment (ECF No. 15) be DENIED, that Plaintiff's Motion to Remand (ECF No. 16) be DENIED, that Defendant's Motion for Summary Judgment (ECF No. 21) be GRANTED and that the final decision of the Commissioner be AFFIRMED.

An appropriate Order consistent with this Memorandum Opinion shall be issued.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

/s/

Elizabeth W. Hanes
United States Magistrate Judge

Richmond, Virginia
Date: March 26, 2021